UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

JOSEPH HOGUE                                    CIV. ACTION NO. 24-0825

VERSUS                                          MAG. JUDGE KAYLA D. MCCLUSKY

FRANK J. BISIGNANO,
COMMISSIONER, U.S. SOCIAL
SECURITY ADMINISTRATION

## MEMORANDUM RULING

Before the court is Plaintiff's petition for review of the Commissioner's denial of social security disability benefits.  Pursuant to 28 U.S.C. § 636(c)(1) and with the consent of all parties, the District Court referred the above-captioned matter to the undersigned magistrate judge for the administration of proceedings and entry of judgment.  For reasons assigned below, the decision of the Commissioner is **AFFIRMED**, and this matter **DISMISSED** with prejudice.

## Background & Procedural History

On December 9, 2021, Joseph Hogue ("Hogue") filed the instant applications for Title II Disability Insurance Benefits and Supplemental Security Income payments.  *See* Tr. 59, 195-207.  Hogue, who was 41 years old at the time of the administrative hearing, *see* Tr. 41, alleged a disability onset date of December 1, 2019, because of schizophrenia.  *See* Tr. 215.  The state agency denied the claims initially on June 24, 2022, and upon reconsideration on March 1, 2023.  (Tr. 15, 58-109; 117-132).  Thereafter, Hogue requested and received a November 21, 2023 hearing before an Administrative Law Judge ("ALJ").  (Tr. 38-57).  However, in a January 11, 2024, written decision the ALJ determined that Hogue was not disabled under the Social Security Act, finding at step five of the sequential evaluation process that he was able to make an adjustment to work that exists in significant numbers in the national economy.  (Tr. 12-24).

Hogue sought review of the adverse decision before the Appeals Council.  On May 15, 2024, however, the Appeals Council denied Hogue's request for review; thus, the ALJ's decision became the final decision of the Commissioner.  (Tr. 1-3).

On June 18, 2024, Hogue filed the instant complaint for judicial review of the Commissioner's final decision.  Following submission of the administrative transcript and supporting memoranda, the matter is now before the Court.

## Standard of Review

This Court's standard of review is (1) whether the final decision is supported by substantial evidence, and (2) whether the Commissioner applied the proper legal standards to evaluate the evidence.  *Keel v. Saul*, 986 F.3d 551, 555 (5th Cir. 2021) (citation omitted).  The Supreme Court has emphasized that

> [t]he phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding.  Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations.  And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla."  It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Biestek v. Berryhill,* 587 U.S. 97, 102-103 (2019) (internal citations omitted).  The reviewing court may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

Upon finding substantial evidence, the court may only review whether the Commissioner has applied proper legal standards and conducted the proceedings consistently with the statute and regulations.  *Carter v. Heckler*, 712 F.2d 137, 140 (5th Cir. 1983).  In other words, where the

Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed – *unless* the Commissioner applied an incorrect legal standard that materially influenced the decision. *See* 42 U.S.C. § 405; *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000); *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001).

## **Determination of Disability**

Pursuant to the Social Security Act ("SSA"), individuals who contribute to the program throughout their lives are entitled to payment of insurance benefits if they suffer from a physical or mental disability. *See* 42 U.S.C. § 423(a)(1)(D). The SSA defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . ." 42 U.S.C. § 423(d)(1)(A). A disability may be based on the combined effect of multiple impairments which, if considered individually, would not be of the requisite severity under the SSA. *See* 20 C.F.R. § 404.1520(a)(4)(ii). Based on a claimant's age, education, and work experience, the SSA utilizes a broad definition of substantial gainful employment that is not restricted by a claimant's previous form of work or the availability of other acceptable forms of work. *See* 42 U.S.C. § 423(d)(2)(A).

The Commissioner of the Social Security Administration has established a five-step sequential evaluation process that the agency uses to determine whether a claimant is disabled under the SSA. *See* 20 C.F.R. §§ 404.1520, 416.920. The steps are as follows,

(1)    An individual who is performing substantial gainful activity will not be found disabled regardless of medical findings.

(2)    An individual will be found not disabled if he or she does not have a "severe impairment," or a combination of impairments that is severe, and

of the requisite duration.

(3)     An individual whose impairment(s) meets or equals a listed impairment in [20 C.F.R. pt. 404, subpt. P, app. 1], and meets the duration requirement, will be considered disabled without the consideration of vocational factors.

Before proceeding to step four, the Commissioner assesses the individual's residual functional capacity, which is used at both step four and step five to evaluate the claim.

(4)     If an individual's residual functional capacity is such that he or she can still perform past relevant work, then a finding of "not disabled" will be made.

(5)     If an individual is unable to perform past relevant work, then other factors including age, education, past work experience, and residual functional capacity must be considered to determine whether the individual can make an adjustment to other work in the economy.  If the individual can make such an adjustment, then he or she will be found not disabled.  If the individual is unable to adjust to other work, then he or she will be found disabled.

*See Boyd*, 239 F.3d at 704-705; 20 C.F.R. §§ 404.1520, 416.920.

When a finding of "disabled" or "not disabled" may be made at any step, a decision will be rendered at that point without proceeding to the remaining steps.  20 C.F.R. §§ 404.1520, 416.920; *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990).  "The claimant bears the burden of proof on the first four steps, but the Commissioner bears the burden on the fifth step."  *Salmond v. Berryhill*, 892 F.3d 812, 817 (5th Cir. 2018) (citation omitted).

## The ALJ's Findings

## I.      Steps One, Two, and Three

The ALJ determined at step one of the sequential evaluation process that the claimant did not engage in substantial gainful activity during the relevant period.  (Tr. 17-18).  At step two, she found that the claimant suffered severe impairments of bradycardia; cardiac arrhythmias;

4

residual effects of open fracture of the left thumb; anxiety disorder; affective disorder; cannabis use disorder; and schizophrenia spectrum disorder.  (Tr. 18).  She concluded, however, that the impairments were not severe enough to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4, at step three of the process.  (Tr. 18-19).

## II.    Residual Functional Capacity

The ALJ next determined that the claimant retained the residual functional capacity ("RFC") to perform light work,[1] except she:

> can never climb ladders/ropes/scaffolds and can occasionally climb ramps/stairs; can perform no work around hazards such as unprotected heights, dangerous moving parts, or work that requires operation of a motor vehicle; can perform frequent handling on the left; can perform work including the ability to understand, remember, and carry out simple and routine instructions and tasks; can make routine work related decisions; and respond appropriately to occasional routine changes in the work setting. Claimant can perform job tasks independently, appropriately, and at a consistent pace in goal-oriented work in which job tasks do not have to be completed within a strict time deadline; and claimant can have occasional interaction with supervisors, coworkers, and the public.

---

[1] Light work entails:

> . . . lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(b), 416.967(b).

5

(Tr. 19-22).

## III.    Steps Four and Five

With the assistance of a vocational expert ("VE") the ALJ determined at step four of the sequential evaluation process that the claimant was unable to return to past relevant work.  (Tr. 22-23).  Accordingly, she proceeded to step five.  At this step, the ALJ determined that the claimant was a younger individual, with at least a high school education.  *Id.*  Transferability of skills was not material to the decision.  *Id.*

The ALJ next observed that, given the claimant's vocational factors, and if he had an RFC that did not include any non-exertional limitations, then the Medical-Vocational Guidelines would direct a finding of not disabled.  20 C.F.R. §§ 404.1569, 416.969; Table 2, Rule 202.21, Appendix 2, Subpart P, Regulations No. 4; Tr. 23.  However, because the claimant's RFC *did* include non-exertional limitations, the ALJ consulted a VE to determine whether, and to what extent the additional limitations eroded the occupational base for work.  *Id.*  In response, the VE identified the representative jobs of **price marker**, *Dictionary of Occupational Titles* ("DOT") Code # 209.587-034; **router**, DOT # 222.687-022; and **housekeeper**, DOT # 323.687-014.  (Tr. 23, 55-56).[2]

### Non-Exhaustive Chronology of Relevant Medical Evidence

On March 3, 2020, Hogue went to the emergency room for an open fracture of the distal

---

[2] The VE responded that for the price marker, router, and housekeeper jobs there were 129,000, 117,000, and 220,000 positions available nationwide, respectively.  (Tr. 23, 55-56).  This incidence of work constitutes a significant number (and range) of jobs in the "national economy."  42 U.S.C. § 423(d)(2)(A); *Johnson v. Chater*, 108 F.3d 178, 181 (8th Cir. 1997) (200 jobs at state level and 10,000 nationally, constitute a significant number).

phalanx of the thumb.  (Tr. 322-329).  The injury was described as a left, partial first finger amputation that happened while Hogue was using a table saw.  *Id.*  Medical providers bandaged the thumb and released him.  *Id.*

On March 18, 2020, Hogue saw Janna Chauvin, APRN ("NP Chauvin"), for wound care for his injured thumb.  (Tr. 335-338).  She noted that Hogue apparently had experienced a near syncope on March 5, 2025.  *Id.*  He was a daily smoker.  *Id.*

On March 18, 2020, Hogue saw Joyce Lockard, FNP, to obtain a letter saying he was unable to work because of his left thumb injury.  (Tr. 411-412).  He was provided a letter for "SNAP."  *Id*.

On August 20, 2021, Hogue told Kathryn Lonsberry, PA-C ("PA Lonsberry"), that, for months now he had been hearing voices and seeing things that he knew were not real.  (Tr. 417-418).  The voices or paranoia had caused he and his wife to separate a few times because of what they told him.  *Id*.  He stated that he could not hold down a "real job" because the voices prevented him from focusing.  *Id*.  Lonsberry prescribed Abilify and Seroquel.  *Id*.

On September 27, 2021, returned to PA Lonsberry and reported that the Seroquel was helping him sleep well at night, but the Abilify made him catatonic.  (Tr. 424-425).  He would just stand/sit and stare and could not be aroused for several minutes to a few hours.  *Id*.  Moreover, he still was experiencing auditory and visual hallucinations.  *Id*.  Lonsberry continued the Seroquel and substituted a trial of Clozapine for the Abilify.  *Id*.

On November 11, 2021, Dr. Tom Colvin referred Hogue to NP Janna Chauvin for psychiatric evaluation and possible medication management.  (Tr. 459-462).  Hogue reported that he was taking Seroquel and Abilify, but Abilify made him "catatonic."  *Id.*  He reported initial onset of hallucinations about two years previously.  *Id.*  He explained that, initially, the

voices were very loud and distracting, but since being on Risperdal, they had become much more manageable but not completely gone. *Id.* He also reported increased headaches. *Id.* He smoked a lot of marijuana as a teen and currently smoked recreationally for his anxiety. *Id.* Hogue inquired about assistance with his disability application, as he has been unable to work consistently for the past two years. *Id.* Chauvin encouraged him to reduce his marijuana intake. *Id.*

On November 21, 2021, Hogue was seen in the emergency room for complaints of psychosomatic anxiety – hyperventilation – near syncope – reaction caused by fear of Risperidone. (Tr. 347-353). Hogue's increased Risperdal had resolved the psychiatric symptoms, but he did not like the way it made him feel, causing him to hyperventilate. *Id.* Hogue reported that he was being controlled by voices but would not elaborate on the full contents of these auditory delusions. *Id.* He was frightened by the voices because they bullied him and made him feel less than fully human. *Id.* He admitted suicidal ideation. *Id.* His urine test was positive for THC. *Id.* He was transferred to a psychiatric and behavioral facility. *Id.*

From November 21-24, 2021, Hogue was confined at Longleaf Hospital on a Psychiatric Emergency Certificate after hearing voices and suicidal ideation. (Tr. 358-365). He was off all of his medications. *Id.* Instead, he was self-medicating with THC. *Id.* He reported hearing voices and feeling very paranoid. *Id.* He saw black figures, animals, and cars flash across his vision. (Tr. 373). He heard voices calling him names and telling him to do things. *Id.* He consumed two to three grams of THC daily for years. (Tr. 375). He also smoked one-half to one pack of cigarettes per day. *Id.*

Upon discharge, he had no functional deficits or physical limitations. (Tr. 358-365). His concentration, recent and remote memory were within normal limits. *Id.* Judgment and insight

8

were poor.  *Id.*  He was diagnosed with paranoid schizophrenia, THC, and nicotine use disorder.
*Id.*  Hogue reported that his long-term goal was to "get on disability."  (Tr. 383).

On December 9, 2021, Hogue returned to NP Chauvin at Franklin Medical Center,
Behavioral Health for follow-up medication management and for treatment of paranoid
schizophrenia.  (Tr. 457-458).  Hogue stated that he had just got out of the hospital, and that he
felt better.  *Id.*  While at Longleaf Hospital, his antipsychotic was changed to Zyprexa, which
made him feel "much better."  *Id.*  He felt "more normal now."  *Id.*  Chauvin noted that he was
positive for cannabis.  *Id.*

 On January 5, 2022, Hogue retuned to NP Chauvin for medication management for
treatment of schizophrenia.  (Tr. 455-456).  He stated that he continued to have frequent visual
hallucinations with some increased anxiety.  *Id.*  Chauvin suggested Prozac and Buspar, but
Hogue said they did not work.  *Id.*

Hogue next saw Chauvin on February 3, 2022, for medication management and for
treatment of schizophrenia.  (Tr. 453-454).  Hogue reported that his anxiety was still bad, but he
was sleeping better.  *Id.*  He had started on Zyprexa but had stopped taking it after one week
because it made him extremely drowsy during the day.  *Id.*  He reported continued daily anxiety
with 10-12 panic attacks per day.  *Id.*  He stated that he had applied for disability because he was
unable to work because of his anxiety and hallucinations.  *Id.*  He wanted a letter stating that he
was "disabled," for food stamps because they wanted him to go to a work program in order to
continue receiving them.  *Id.*  Chauvin explained that she did not make determinations regarding
disability.  *Id.*  **She noted that Hogue did not appear anxious during the examination and
had no observable symptoms of auditory or visual hallucinations during the visit**.  *Id.*  She
remarked that, because his presentation was the opposite of his reported symptoms, malingering

could not be ruled out. *Id*

Hogue's next monthly visit with Chauvin was on March 3, 2022. (Tr. 451-452). He reported that he was "feeling better." *Id.* She noted that he was started on Zoloft and hydroxyzine during the last office visit, which was incongruent with his appearance at the clinic. *Id.* He reported that the new medication helped his anxiety with no new problems or side effects noted. *Id.* He felt that his symptoms were well managed now. *Id.* **Although he continued to have audio/visual hallucinations, they were decreased in frequency and intensity and not distressing to him at all**. *Id.*

On April 7, 2022, Hogue returned to Chauvin for follow-up for treatment of schizophrenia, insomnia, and anxiety. (Tr. 449-450). He reported that, "things are going pretty good." *Id.* He stated that he was doing well on his current medication. *Id.* His anxiety was doing better with Zoloft, with decreased frequency of panic attacks. *Id.* He still had daily symptoms, but they were significantly decreased. *Id.* He was sleeping well and denied panic attacks. *Id.* He said he was not really depressed. *Id.* He reported frequently seeing shadows, hearing whispers, usually when he was alone. *Id.* Memory/concentration were within normal limits and insight/judgment was good. *Id.* He had declined therapy previously. *Id.*

On April 7, 2022, Hogue returned to Chauvin where he reported that things were going "pretty good." (Tr. 513-514). He stated that he was doing well on his current medication regimen. *Id.* His anxiety had been doing better with decreased frequency of panic attacks. *Id.* He still had daily symptoms, but they were significantly decreased. *Id.*

On May 10, 2022, Hogue saw Chauvin for follow-up for medication management. (Tr. 511-512). He was taking his medications as ordered. *Id.* He still had hallucinations but was able to function with them. *Id.* He ignored the hallucinations most of the time. *Id.* His wife felt

10

that he was doing "great," on his current treatment plan, compared to prior medications.  *Id.*  His memory and concentration were within normal limits and he had good insight and judgment.  *Id.*

On May 18, 2022, non-examining agency psychologist, Lauren Robinson, Psy. D., reviewed the record and applied the psychiatric review technique.  (Tr. 61-63).   She also completed a mental RFC finding that Hogue was moderately limited in his ability to  maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and to be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to changes in the work setting; and to set realistic goals or make plans independently of others.  (Tr. 64-66).

On June 7, 2022, Hogue saw Chauvin for medication management.  (Tr. 509-510).  He again reported that things were going pretty good.  *Id.*  Lately, however, he had been experiencing increased auditory hallucinations, with intermittent depressive symptoms.  *Id.*  His memory and concentration were within normal limits and his insight/judgment were good.  *Id.*

On June 24, 2022, non-examining agency physician, Susan Yoshida, reviewed the record, and opined that Hogue had no exertional or postural limitations, but was limited to frequent manipulating on the left side.  (Tr. 63-64).  Hogue also needed to avoid all exposure to hazardous machinery, heights, etcetera because of a history of syncope.  *Id.*

On July 12, 2022, Hogue had a telehealth appointment with NP Chauvin.  (Tr. 507-508).  He denied any new complaints and was doing well overall.  *Id.*  He felt like his medication was working well.  *Id.*  He reported, however, that his A/V hallucinations and anxiety interfered with his ability to work.  *Id.*  Crowds seemed to worsen his anxiety.  *Id.*  However, he was well-

managed at home on his current medications.  *Id.*  He occasionally had panic attacks, but they were decreased.  *Id.*  He had no hallucinations or delusions during the interview.  *Id.*  His memory/concentration were within normal limits. *Id.*  His insight and judgment were good.  *Id.*

On August 17, 2022, Hogue had another telehealth appointment with NP Chauvin.  (Tr. 505-506).  He reported that he was doing well and that his medications were working well.  *Id.* His mood had been relatively stable.  *Id.*  He stated that he has "kind of gotten used" to his hallucinations and no longer found them distressing.  *Id.*  He had been denied disability but was reapplying with the assistance of a lawyer.  *Id.*  His Zoloft had been doing really well for his anxiety and depression, and he had not experienced any panic attacks since his last office visit. *Id.*  His memory and concentration were within normal limits.  *Id.*

On September 22, 2022, Hogue returned to NP Chauvin for medication management. (Tr. 503-504).  He reported that he was doing "okay."  *Id.*  He experienced daily anxiety, with frequent panic attacks.  *Id.*  However, they were improved with an increased dose of Zoloft.  *Id.* Hogue had no hallucinations or delusions during the interview.  *Id.*  His memory and concentration were within normal limits.  *Id.*  His insight and judgment were good.  *Id.*

On November 3, 2022, Hogue had a telehealth visit with NP Chauvin and reported that he was doing "pretty good."  (Tr. 501-502).  He denied issues with medication and had decreased frequency of A/V hallucinations.  *Id.*  Anxiety and depressive symptoms were well managed.  *Id.* He denied any recent panic attacks.  *Id.*  His sleep was good.  *Id.*

At a February 10, 2023, telehealth visit, Hogue again was doing well with his symptoms, which were well managed with medication.  (Tr. 499-500).  He continued to have some A/V hallucinations but they were nowhere near as bad and **did not interfere with daily functioning**. *Id.*

At the request of the state agency, Hogue underwent a February 21, 2023 consultative psychological examination with David Williams, Ph.D.  (Tr. 465-471).  Hogue reported that he heard voices and saw hallucinations that did not go away.  *Id.*  He explained that, whenever he was in a high-stress situation, "it gets worse."  *Id.*  He stated that he experienced 30-40 panic attacks per month that lasted from 15-20 minutes each.  *Id.*  The panic attacks included heavy breathing, "spacing out," and rocking back and forth.  *Id.*  However, he had never presented to the emergency room for a panic attack.  *Id.*  His onset of psychosis was around 2019.  *Id.*  He experienced auditory and visual hallucinations, plus delusional thinking.  *Id.*  He described the auditory hallucinations as music and a voice talking to him that he thinks is God.  *Id.*  The hallucinations were described as multiple voices.  *Id.*  They were consistently severe day and night, but episodic.  *Id.*  Dr. Williams remarked that, although Hogue's auditory hallucinations were "fairly consistent" with what is commonly heard by those suffering from mental illness, his visual hallucinations were not.  *Id.*  He had no history of any significant medical problems.  *Id.*  He smoked a pack of cigarettes per day and was unable to recall the last time he smoked marijuana.  *Id.*  He has been unemployed since 2018 when he stopped working because he was hearing and seeing things.  *Id.*  He was terminated because he missed too many days.  *Id.*  He reported that his mental illness prevented him from being able to work because he remained under stress as a result of the hallucinations.  *Id.*  He constantly worried about harming himself while working.  *Id.*

**Upon examination, there were no objective signs of hallucinations**.  *Id.*  He was alert and oriented to person, place, time, and situation.  *Id.*  He demonstrated knowledge of basic math and working definitions of four of five terms.  *Id.*  He was able to count and make correct change.  *Id.*  He read at a high school level.  *Id.*  He was able to read both simple and complex

13

sentences.  *Id.*  Immediate memory was intact, but delayed memory was weak.  *Id.*  Mental flexibility and working memory were adequate.  *Id.*  He was able to successfully follow a three-step command.  *Id.*  He demonstrated adequate social skills.  *Id.*  Judgment and insight were adequate.  *Id.*  Overall, concentration and persistence were moderately limited because of anxiety.  *Id.*  He complained about hallucinations, but there were no objective signs of hallucinations.  *Id.*  In other words, he was not responding to hallucinated stimuli.  *Id.*  He lost focus at times, but that did not appear to be the result of any hallucinations.  *Id.*  His effort was judged to be adequate.  *Id.*  Several elements of his description of psychosis were atypical.  *Id.*  For example, his onset of psychosis was later than what is commonly seen.  *Id.*  Furthermore, visual hallucinations are rarely experienced as black and white, and they are almost never co-occurring with auditory hallucinations.  *Id.*  Finally, hallucinations are rarely consistently severe during the daytime and the nighttime.  *Id.*

In his assessment, Dr. Williams opined that Hogue's ability to understand and carry out instructions was not limited.  *Id.*  He was able to complete a simple three-step command.  *Id.*  Immediate and long-term memory were mildly limited.  *Id.*  Concentration, pace, and persistence were moderately limited.  *Id.*  Social functioning was moderately to significantly limited.  *Id.*  His ability to be aware of normal hazards and to take appropriate action was not limited.  *Id.*  Adaptation was significantly limited.  *Id.*  He was capable of managing funds independently.  *Id.*  The prognosis for significant improvement over the course of the next twelve months was guarded.  *Id.*

On March 1, 2023, non-examining agency psychologist, Robert Clanton, Ph.D., reviewed the record and completed a mental RFC, finding that Hogue was moderately limited in his ability to carry out detailed instructions;  maintain attention and concentration for extended

14

periods; perform activities within a schedule, maintain regular attendance, and to be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; to respond appropriately to changes in the work setting; and to set realistic goals or to make plans independently of others.  (Tr. 85-87).  Clanton explained that Hogue could function in a familiar, standardized work environment with minimal variation.  *Id.*  He was capable of attending to basic activities of daily living, but likely will require assistance with more complex tasks, such as management of finances.  *Id.*

On March 1, 2023, non-examining agency physician, Jerry Davis, M.D., reviewed the record and opined that Hogue had no exertional or postural limitations, but was limited to occasional manipulating on the left side.  (Tr. 84-85).  He also should never be around heights. *Id.*

On June 13, 2023, Hogue returned to NP Chauvin for follow-up for treatment of his schizophrenia, generalized anxiety disorder, and major depression.  (Tr. 497-498).  Overall, he was doing well.  *Id.*  He continued to experience hallucinations and became very anxious in crowds, especially around strangers.  *Id.*  He was distracted easily, had to have prompts and cues to complete tasks, and had issues with multi-step tasks.  *Id.*

Also on June 13, 2023, Chauvin, completed a mental capacity assessment for Hogue. (Tr. 480-482).  She stated that his diagnoses included schizophrenia, generalized anxiety, panic disorder, and major depressive disorder.  *Id*.  She wrote that Hogue experienced chronic auditory

15

and visual hallucinations that distracted him and interfered with his ability to stay on task. *Id*. She indicated that Hogue had *moderate* limitations of functioning in his ability to follow one or two step oral instructions; to use reason and judgment to make work-related decisions; to initiate and perform a task; to work close to or with others without interrupting or distracting them; to sustain an ordinary routine and regular attendance; to work a full work day without needing more than allotted number or length of rest periods; to adapt to change; to manage psychologically based symptoms; to distinguish between acceptable and unacceptable work performance; to set realistic goals; to maintain personal hygiene and appropriate attire; and to be aware of normal hazards. *Id*. In addition, he had *marked* limitations in his ability to sequence multi-step activities; to work at an appropriate and consistent pace; to ignore or avoid distractions while working; and to make plans independently of others. *Id*. In all other areas he was mildly limited, including interacting with others. *Id*. She also indicated that he has zero routine alcohol or drug use. *Id*. Finally, she remarked that Hogue became very anxious in social settings and interacting with others outside of family members. *Id*.

<u>**Analysis**</u>

Hogue advanced two assignments of error.[3]  The Court will address them in turn.

**I.      The ALJ erred by rendering an RFC that does not include work-related limitations consistent with the opinions of consultative examiner, Dr. Williams, nor that of the state agency medical consultants, both of whom the ALJ found to be at least somewhat persuasive.**

---

[3] Hogue did not challenge the ALJ's assessment of the effects of his physical impairment(s), which the ALJ rather generously reduced to the light exertional level.  Therefore, the Court will confine itself to a discussion of the effects of Hogue's mental impairments.  Furthermore, the findings of the agency physicians provide a baseline of support for the ALJ's physical RFC.

a)      Hogue first argues that the ALJ failed to explain why she did not adopt Dr. Williams' purported opinion that his "adaptation" was *markedly* limited, despite the fact that Dr. Williams stated only that his adaptation was *significantly* limited.  Hogue reasons that "significantly" necessarily equates to "marked"  because Williams "opined just previously in the opinion that [his] social functioning was 'moderately to significantly limited' . . ."  (Pl. Brief, pg. 7).  Hogue goes on to argue that, because the ALJ found Dr. Williams' opinion "persuasive," she erred by failing to adopt the "marked" limitation of functioning in her RFC or otherwise by omitting any explanation for why she did not incorporate that limitation.  *Id*.

Hogue's argument fails on multiple levels.  First, the ALJ stated that Dr. Williams' opinion was "*mostly consistent* with the overall record and is persuasive *insofar as it is consistent with the RFC set forth herein*."  (Tr. 22) (emphasis added).  In other words, she considered Dr. Williams' opinion but rejected those portions of the opinion that were not consistent with her RFC.  Still, Hogue faults the ALJ for failing to articulate any specific reason for rejecting the limitations that were inconsistent with the ALJ's RFC.  Hogue's protestations notwithstanding, the ALJ's terse discussion was sufficient.  *See Miller v. Kijakazi*, No. 22-60541, 2023 WL 234773, at *3–4 (5th Cir. Jan. 18, 2023) (ALJ acknowledged opinions contained more limiting restrictions, but did not find them persuasive).

In any event, a closer review of Dr. Williams' report reveals that Hogue attributed his stress and inability to perform adaptive living skills to his auditory and visual hallucinations. (Tr. 466).  However, Dr. Williams observed no objective signs of hallucinations and further noted various inconsistencies in Hogue's description of his hallucinations.  (Tr. 468-469).  In fact, Dr. Williams wanted to review Hogue's treatment records to improve upon his diagnostic

17

impressions.  (Tr. 469).  Of course, while Hogue's treating mental health provider, NP Chauvin, eventually completed a medical source statement that endorsed Hogue's allegations of impairment, her early treatment notes document her skepticism with his presentation, with no indication that the diagnosis ever was confirmed by objective signs.  *See* discussion, *supra*.  In fact, that is precisely what the ALJ stated in her decision:  "[a]s for the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms, they are inconsistent because *the objective evidence does not support the degree of limitation alleged*."  (Tr. 20) (emphasis added).

In short, the rationale for the ALJ's rejection of Dr. Williams' "marked" limitation of functioning may be inferred from the remainder of her decision and the record.  Regardless, an ALJ's error in failing to provide sufficient explanation for her consideration of the medical opinions does not require remand where, (1) the record reflects that the ALJ recognized that the opinions contained more limiting restrictions but did not find them to be persuasive, and (2) the plaintiff "fails to show that if the ALJ had given further explanation, then she would have adopted them."  *Miller*, 2023 WL 234773, at *3–4.  The foregoing circumstances are present here.

Furthermore, Hogue's argument overlooks the reasonable possibility that by using the term, "significantly limited," Dr. Williams may have intended some intermediate level of

limitation between "moderate"[4] and "marked."[5]   In her RFC, the ALJ limited Hogue to "routine work related decisions," and only "occasional routine changes in the work setting," restrictions that do not appear to be completely inconsistent with a "significant" limitation in this area.  In fact, the Fifth Circuit recently recognized that an ALJ's adoption of a "frequent" limitation of functioning, i.e., from one-third to two-thirds of the time, did not "clearly conflict" with a doctor's opinion that the claimant had a "moderate" limitation in that area.  *See Madkins v. Bisignano*, 24-60485, 2025 WL 2527462, at *3 (5th Cir. Sept. 3, 2025).  Utilizing this same rationale, it stands to reason that a limitation to *occasional*[6] does not "clearly conflict" with an alleged *marked* limitation in that area of functioning.

Finally, it is worth noting that, at least one of the representative jobs that the ALJ relied upon at step five of the sequential evaluation process, had a Reasoning Level of 1, which requires the worker to "[a]pply commonsense understanding to carry out *simple one- or two-step instructions*.  Deal with standardized situations *with occasional or no variables* in or from these situations encountered on the job."  *DOT* # 323.687-014 Cleaner, Housekeeping, 1991 WL

---

[4] A "moderate" limitation means that the claimant's ability to function in this area "independently, appropriately, effectively, and on a sustained basis is **fair**."  20 C.F.R. pt. 404, subpt. P, App. 1, § 12.00F(2)(c) (emphasis added).

[5] A "marked" limitation means that the ability to function "independently, appropriately, effectively, and on a sustained basis is **seriously** limited."  20 C.F.R. pt. 404, subpt. P, App. 1, § 12.00F(2)(d) (emphasis added).

[6] "Occasionally" is defined as occurring from very little, up to one-third of the time, i.e. no more than about two hours in an eight-hour workday. *See* TITLES II AND XVI: DETERMINING CAPABILITY TO DO OTHER WORK—THE MEDICAL—VOCATIONAL RULES OF APPENDIX 2 ("SSR 83–10").

672783.  In other words, this representative job appears to permit even a "serious" limitation in adaptation.  *See Kelly P. v. Saul*, Civ. Action No. 18-0777, 2019 WL 3573591, at *5 (C.D. Cal. Aug. 6, 2019) (no obvious conflict between plaintiff's limitation to minimal changes in the workplace setting or routine and a job with a Reasoning Level of 2).  Accordingly, any error was harmless.[7]

b)      Hogue also emphasizes that, at the reconsideration level of his claim, the agency psychologist, Dr. Clanton, purportedly limited Hogue to "no more than simple 1-2 instructions," which the ALJ not only failed to address, but also incorrectly characterized as the ability to "understand and remember 3-4 step instructions but may have difficulty with more complex." (Pl. Brief, pgs. 7-8) (citing Tr. 22, 97).

Hogue's argument misses the mark.  Dr. Clanton never opined that Hogue was limited to only simple, 1-2 step instructions.  Rather, he said that, in the domain of sustained concentration and persistence, Hogue was capable of carrying out "*at least* simple, 1-2 step instructions but may have difficulty with more complex tasks.  *The claimant's symptoms would not prevent sustaining mental demands associated with performance of simple, routine tasks throughout an ordinary workday/workweek*."  (Tr. 97) (emphasis added).  Furthermore, in the domain of understanding and memory limitation, Dr. Clanton plainly stated that "[t]he claimant is *capable of understanding and remembering 3-4 step instructions* but may have difficulty understanding and remembering more complex, multi-step instructions."  (Tr. 96)  (emphasis added).

---

[7] *See Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007) (ALJ's omission does not require remand unless it affected claimant's substantial rights).

Of course, the ALJ adopted an RFC that limited Hogue to understanding, remembering, and carrying out simple and routine instructions, which does not conflict with the limitations in Dr. Clanton's opinion.  (Tr. 19).  Furthermore, the representative jobs relied upon by the ALJ at step five of her decision all had a specific vocational preparation ("SVP") time of 2,[8] which is considered unskilled work,[9] and thus, by definition, "work which needs little or no judgment to do *simple* duties that can be learned on the job in a short period of time."  (SSR 83-10) (emphasis added)).

Moreover, as stated earlier, the housekeeper job utilized by the ALJ in her decision has a reasoning level of 1, which contemplates "simple one-or-two step instructions."  *DOT* # 323.687-014 Cleaner, Housekeeping, 1991 WL 672783.  The two other representative jobs, router and marker, both have a reasoning level of 2, which courts have found to be consistent with the ability to perform 1-2 step instructions in a simple, routine environment.  *See Dugas v. Astrue*, 1:07-CV-605, 2009 WL 1780121, at *6 (E.D. Tex. June 22, 2009) (collecting cases).

In sum, the Court finds that the ALJ did not err in her consideration and characterization of Dr. Clanton's opinion, and, in any event, any error was harmless.

## II.    The ALJ erred by failing to adequately evaluate the opinion of Janna Chauvin, PMHNP-BC.

In his second assignment of error, Hogue argues that the ALJ failed to articulate the

---

[8]  *See DOT* # 323.687-014 Cleaner, Housekeeping, 1991 WL 672783; DOT # 222.687-022 Router, 1991 WL 672133; and DOT # 209.587-034 Marker, 1991 WL 671802.

[9]  TITLES II AND XVI: USE OF VOCATIONAL EXPERT AND VOCATIONAL SPECIALIST EVIDENCE, AND OTHER RELIABLE OCCUPATIONAL INFORMATION IN DISABILITY DECISIONS ("SSR-00-4p").

supportability and consistency of NP Chauvin's medical source statement.  He also asserts that the ALJ failed to explain why she did not incorporate some of NP Chauvin's limitations into her RFC.

For claims such as this that were filed on or after March 27, 2017, the Commissioner no longer affords "controlling weight" to the opinions of treating medical providers and will not defer or give any specific evidentiary weight to any medical opinion(s) from the claimant's medical sources.  20 C.F.R. §§ 404.1520c(a) and 416.920c(a); *see also Webster v. Kijakazi*, 19 F.4th 715, 719 (5th Cir. 2021).  Furthermore, the fact that a medical source actually examined the claimant or specializes in an area germane to the claimant's medical issues are not primary or dispositive considerations in assessing the medical opinion.  *See* 20 C.F.R. §§ 404.1520c(c) and 416.920c(c).  Rather, when determining the persuasiveness of a medical opinion, the most important factors are supportability and consistency.  20 C.F.R. §§ 404.1520c(b)(2) and 416.920c(b)(2).

"Supportability" focuses upon how "relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s) . . ." 20 C.F.R. §§ 404.1520c(c)(1) and 416.920c(c)(1).  "Consistency" refers to how "consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim . . ." 20 C.F.R. §§ 404.1520c(c)(2) and 416.920c(c)(2).

Only when two or more medical opinions about the same issue are both equally well-supported and consistent with the record, but "not exactly the same," will the Commissioner then articulate how she considered the "other most persuasive factors," such as the medical source's

22

relationship with the claimant (including the length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and the examining relationship); the medical source's specialization; and other factors (including a medical source's familiarity with other evidence of the claim or an understanding of the agency's disability program's policies and evidentiary requirements).  20 C.F.R. §§ 404.1520c(b)(3)-(c) and 416.920c(b)(3)-(c).  Otherwise, the Commissioner, may, but is not required to explain these additional factors.  20 C.F.R. §§ 404.1520c(b)(2) and 416.920c(b)(2).

Furthermore, under the new regulations, the ALJ no longer is prohibited from assigning more weight to the findings of a non-examining physician over a contrary finding by a treating or examining physician.  *Williams v. Kijakazi*, No. 23-30035, 2023 WL 5769415, at *2 (5th Cir. Sept. 6, 2023) (new regulations eliminate the old hierarchy of medical opinions and do away with the examining and non-examining physician dichotomy) (citation omitted).

In her decision, the ALJ determined that the June 2023 medical source statement completed by NP Chauvin was not persuasive.  (Tr. 21).  She explained that the statement was not supported by other medical evidence of record or by Chauvin's own longitudinal records showing that Hogue's mental status, since 2021, had generally been stable and controlled with medication.  *Id*.  Instead Chauvin's opinion appeared to be based on Hogue's subjective complaints, rather than objective findings.  *Id*.  In other words, the ALJ found that the statement was not persuasive because it was neither supported by objective medical evidence, nor consistent with other medical records or Chauvin's own treatment records.  The ALJ's determination is supported by substantial evidence.  *See* relatively benign treatment records, *supra*.

A relatively recent decision by the Fifth Circuit proves instructive. In *Webster v. Kijakazi*, the Court stated that,

> the ALJ considered both the consistency and supportability of Dr. Small's testimony in light of other medical opinions and evidence in the record, including Webster's hospital and VA treatment records. Ultimately, the ALJ determined that Dr. Small's testimony was only "supported" by his own findings and was inconsistent with Webster's medical history and longitudinal psychiatric treatment records indicating improvement to the symptoms caused by Webster's PTSD. **Though the ALJ neither adopted the state agency report verbatim nor accepted the testimony of Dr. Small**, it cannot be said that his decision was not based on substantial evidence or that he improperly applied the relevant legal standards.

*Webster,* 19 F.4th at 719 (emphasis added).

In this case, the ALJ's analysis of Chauvin's opinion is no less detailed than what passed muster in *Webster*. The ALJ cited specific findings which she deemed unsupported by the record as a whole. In lieu of same, she generally credited the findings of the consultative and agency psychologists, which she deemed to be consistent with the evidence of record. (Tr. 21-22). While the undersigned may not have weighed the evidence in the same manner as the ALJ, the instant review is not *de novo*. Furthermore, the Court is unable to conclude that no reasonable mind could accept as adequate the ALJ's proffered rationale for discounting NP Chauvin's opinion. *See Biestek,* 587 U.S. at 102-103.[10]

---

[10] *See Ward v. Barnhart,* 192 Fed. App'x. 305, 308 (5th Cir. 2006) (conflicting treatment notes and other first-hand medical evidence supported ALJ's decision to reject treating physician's opinion); *Nugent v. Astrue,* 278 Fed. App'x. 423, 426 (5th Cir. 2008) (conflicting medical evidence supported ALJ's decision to place little weight on physician's opinion); *Richard ex rel. Z.N.F. v. Astrue*, 480 Fed. App'x. 773, 779 (5th Cir. 2012) (ALJ may discredit physician's opinion by pointing to contrary evidence, albeit however tersely); *Garth v. Astrue*, 393 F. App'x. 196, 199 (5th Cir. 2010) (court noted that ALJ *could have* discounted treating physician's opinion because the opinion contradicted his own treatment notes and the claimant's

Similar to Dr. Williams' purportedly inconsistent limitation discussed above, even if the ALJ had failed to adequately "explain how she considered the supportability and consistency factors" for NP Chauvin, remand is warranted only if the error was harmful, i.e., that the claimant was prejudiced thereby. *Miller*, 2023 WL 234773, at *3. Hogue has not made the requisite showing here. *Id*. Accordingly, any error was harmless. *Walker v. Kijakazi*, No. 23-60116, 2023 WL 7443302, at *4 (5th Cir. Nov. 9, 2023) (harmless error where ALJ did not expressly mention "supportability" and "consistency," and plaintiff failed to show that further explanation by ALJ would have resulted in ALJ changing her mind).

## Conclusion

The ALJ in this case was tasked with determining whether the claimant was disabled. In so doing, she considered the application paperwork, the hearing testimony, the medical records, and the expert opinion evidence. The evidence was not necessarily uniform, and, according to Hogue, should have compelled a different result. However, conflicts in the evidence are for the Commissioner to resolve. *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990) (citation omitted); *Grant v. Richardson*, 445 F.2d 656 (5th Cir. 1971) (citation omitted). This Court may

---

admissions); *Vansa v. Astrue*, 423 F. App'x 381, 383 (5th Cir. 2011) (upholding ALJ's decision to discount treating physician's opinion because, as the ALJ explained, it was "not supported by the objective findings of his own clinic notes nor by the evidence as a whole."); *Webster*, 19 F.4th at 719 (ALJ considered both the consistency and supportability of the physician's testimony, but ultimately determined that physician's testimony was only "supported" by his own findings and was inconsistent with the claimant's medical history and longitudinal psychiatric treatment records); *Daigle v. Kijakazi*, No. 22-30721, 2023 WL 4501865 (5th Cir. July 12, 2023) (ALJ made credible choice finding physician's opinion unpersuasive in light of multiple other pieces of medical evidence).

not "reweigh the evidence in the record, try the issues de novo, or substitute its judgment for the Commissioner's, even if the evidence weighs *against* the Commissioner's decision." *Newton,* 209 F.3d at 452 (emphasis added).[11]  That is not to say that the Commissioner's decision necessarily is blemish-free, but procedural perfection in the administrative process is not required, and any errors do not undermine confidence in the decision.  *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988).[12]

For the foregoing reasons, the undersigned finds that the Commissioner's determination that the claimant is not disabled under the Social Security Act is supported by substantial evidence and remains free of legal error.

Accordingly, by separate judgment, the Court will AFFIRM the Commissioner's decision, in its entirety, and DISMISS this civil action, with prejudice.

In Chambers, at Monroe, Louisiana, on this 21st day of September, 2025.

KAYLA DYE MCCLUSKY
UNITED STATES MAGISTRATE JUDGE

---

[11] Generally, courts "only may affirm an agency decision on the basis of the rationale it advanced below." *January v. Astrue,* 400 Fed. App'x. 929 (5th Cir. 2010) (citation omitted).  One exception to this rule, however, is harmless error, i.e. absent the alleged error or omission, there is "no realistic possibility" that the ALJ would have reached a different result.  *Id*.

[12] Procedural improprieties "constitute a basis for remand only if such improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision."  *Morris v. Bowen,* 864 F.2d 333, 334 (5th Cir. 2007).